# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

TAMI HERRING on behalf of
B.H.,

                **Plaintiff,**

**-vs-**                                        **Case No.  6:05-cv-513-Orl-28KRS**

COMMISSIONER OF SOCIAL
SECURITY,

                **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

      This cause came on for consideration without oral argument on the Complaint filed by

Tami Herring on behalf of her step-daughter, Brittany, seeking review of the final decision of the

Commissioner of Social Security denying the claim for social security disability benefits for

Brittany.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the

record before the Social Security Administration (SSA).  Doc. No. 7.  This matter has been

referred to me for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b) and

Middle District of Florida Local Rule 6.01(c)(21).

**I.        PROCEDURAL HISTORY**.

      In February 2002, Herring applied for benefits for Brittany under the children's disability

provisions of the Supplemental Security for the Aged, Blind and Disabled program (SSI), 42

U.S.C. § 1381, *et seq.* (sometimes referred to herein as the Act), alleging that Brittany became

disabled as of January 2, 2002.  R. 50.  Herring's claim was denied initially and on

reconsideration.   R. 35-36, 38-43.

Herring timely requested a hearing before an administrative law judge (ALJ).  R. 44.  An

ALJ held a hearing on March 10, 2004.  Herring and Brittany, who were represented by a non-

attorney, testified. R. 208-31.

After considering the testimony and the medical records presented, the ALJ determined

that Brittany had never engaged in substantial gainful activity.  R. 16. She found that Brittany's

Attention Deficit Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder (ODD)[1]

were severe impairments.  R. 18.  The ALJ determined that these impairments did not meet or

medically equal the criteria for any of the impairments listed in the applicable social security

regulations.[2] *Id*.

Because the ALJ concluded that Brittany's impairments did not meet any of the listed

impairments, she proceeded to address whether Brittany's impairments were functionally

equivalent to the listings under six domains of functioning, which are as follows: (i) acquiring and

using information; (ii) attending and completing tasks; (iii) interacting and relating with others;

---

[1]        "Oppositional defiant disorder is a pattern of disobedient, hostile, and defiant behavior toward authority figures.  The pattern must persist for at least 6 months and must go beyond the bounds of normal childhood misbehavior."  *See* MEDLINE PLUS, MEDICAL ENCYCLOPEDIA, http://www.nlm.nih.gov/medlineplus/ency/article/001537.htm (last visited April 12, 2006).

[2]        The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

(iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical

well-being.[3]  R. 18-21.

The ALJ made the following findings under each domain.

(i) **Acquiring and Using Information**. The ALJ found that Brittany had less than marked

limitations in this domain. In support of this finding, the ALJ wrote as follows:

> The medical evidence reveals that [Brittany] has [ADHD]and [ODD], which were
> originally affecting her progress at school.  However, [Brittany's] current progress
> report card reveals that she is within the average range in spelling, reading,
> language and mathematics.  She obtained A's and B's with good put forth in effort.

R. 19.

(ii) **Attending and Completing Tasks**.  The ALJ concluded that Brittany had marked

limitations in this domain.  In support of this finding, the ALJ wrote as follows:

> The medical evidence reveals that [Brittany] has [ADHD].  The
> medical evidence reveals that [Brittany] experiences difficulties
> staying focus[ed], paying attention, concentrating, listening, staying
> on her seat[,] and completing tasks on time. [Her] teacher has
> reported that Brittany has difficulty staying on task and that she has
> to be redirected three to four times an hour. [Brittany] was also
> experiencing difficulties completing assignments within the allotted
> time frames.  On mental status, [Brittany] was noted to be fidgety
> and needed redirection.

R. 20.

(iii) **Interacting and Relating with Others**.  The ALJ found that Brittany had less than

marked limitations in this domain. In support of the finding, the ALJ wrote as follows:

> The medical evidence reveals that [Brittany] has [ODD].  Initially,
> [Brittany] was experiencing disruptive behavior such as excessive
> anger, aggression, lying, acting out in the classroom, excessive
> talking, poor memory and concentration, impulsivity, and
> hyperactivity.  However, the medical evidence reveals that [Brittany]

---

[3]      20 C.F.R. § 416.926a(b)(1).

> improved with medication and behavioral management intervention.
> [Brittany] received counseling and education about the importance
> of following rules and directions.  She has responded in a positive
> manner to guidance.  On a group outing activity, [Brittany]
> functioned in an independent manner. [Her] behavior was excellent.

*Id.*

(iv) **Moving About and Manipulating Objects**.  The ALJ concluded that Brittany had no

limitations in this domain.  *Id*.

(v) **Caring for Yourself**.  The ALJ concluded that Brittany had no limitations in this

domain. *Id*.

(vi) **Health and Physical Well-Being**.  The ALJ concluded Brittany had no limitations in

this domain.  R. 21.

In reaching these conclusions, the ALJ specifically found that the opinion of Kelly

McCabe, Brittany's case manager, that Brittany had marked limitations in communicative

functioning and personal function, and an extreme limitation in social functioning, was "extreme

and not consistent with the medical evidence as a whole."  R. 22.

The ALJ observed that Brittany had been assessed a Global Assessment of Functioning

(GAF) of 40[4] by Paul Jacobson, M.D., a physician at Devereux Treatment Network, but observed

---

[4]      The GAF scale is used to report an individual's overall level of functioning. A GAF
rating between 31 and 40 reflects:

> Some impairment in reality testing or communication (e.g., speech is at times
> illogical, obscure, or irrelevant) OR major impairment in several areas, such as
> work or school, family relations, judgment, thinking, or mood (e.g., depressed man
> avoids friends, neglects family, and is unable to work; child frequently beats up
> younger children, is defiant at home, and is failing at school).

HAROLD I. KAPLAN, M.D. & BENJAMIN J. SADOCK, M.D., SYNOPSIS OF PSYCHIATRY 299 (8th ed.
1998) (SYNOPSIS OF PSYCHIATRY).

that she was "convinced that these scores were based on [Herring's] responses about [Brittany's]

behavior." R. 22.  In support of this conclusion, the ALJ observed as follows:

> [T]he medical evidence reveals that [Brittany] has responded in a positive manner
> to behavior management intervention.  Her behavior has been reported as excellent
> when sharing with groups. [Brittany's] cognitive functioning has also been reported
> as normal. [Brittany] did not exhibit any behavior problems during treatment at
> Devereux. [Her] third grade progress report fails to show that [she] is experiencing
> significant difficulties with her behavior.  She obtained A's and B's and only
> need[s] improvement in the areas of using time well and working and playing with
> others.

R. 22.

Because the ALJ concluded that Brittany did not have an extreme limitation in any one

domain, or marked limitations in two domains, the ALJ concluded that Brittany's impairments did

not functionally equal any listing.  R. 22; *see* 20 C.F.R. § 416.926a(d).  As such, the ALJ

concluded that Brittany was not disabled for purposes of the Act.  R. 23.

Herring requested review by the Appeals Council, which request was denied.  R. 3-5, 8-10.

This timely appeal followed.  Doc. No. 1.

## II.    JURISDICTION.

The Commissioner issued a final decision after a hearing with respect to Herring's

application for SSI benefits for Brittany. Therefore, the Court has jurisdiction of this matter under

42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.   STATEMENT OF FACTS.

### A. Testimony and Other Evidence from Brittany Herring.

Brittany was born on June 27, 1995.  R. 50. At the time of the hearing, Brittany was in the

third-grade.  R. 213. She enjoyed reading and disliked science classes.  R. 213.  Brittany reported

that she got A's and B's and sometimes C's.  R. 213.  Herring testified that Brittany was doing well in school in large part because of medication.  R. 227.

Brittany had behavioral problems at school.  She hit numerous students and even teachers. R. 218-19, 221.  The day before the hearing Brittany had hit another student who yelled at her.  R. 217-18.  However, she had never been suspended from school for fighting.  R. 218-19.

Herring had problems controlling Brittany.  Brittany would "hit, push, [and] kick to get what she wants.  She's got to be in control of every situation."  R. 225.  She fought back against her parents, did not assume responsibility for her actions, and would lie about things.  R. 225-26. She also fought with her brothers.  R. 215.  She once hit one of her brothers with a broom so hard that he required stitches.  R. 223.   On another occasion, she slammed a car door so hard the window broke.  R. 224.

Brittany enjoyed swimming and playing outside.  R. 216-17. She had friends at school, but did not play with them outside of school.  R. 213-14.  She played with her brothers at home.  R. 219-20.  She did not have other friends in her neighborhood.  R. 219.   She also was not involved in any clubs or other organizations like Girl Scouts.  R. 214.

Brittany had problems playing by herself because she could not concentrate or sit still.  R. 224.  She could sit for between five and ten minutes before becoming distracted.  R. 227. A therapist took Brittany on outings but needed to redirect her frequently.  R. 228.

While Brittany testified that she was able to care for her personal hygiene,  R. 216-17, Herring reported that Brittany would not do so, R. 225.  Herring had to fight with Brittany to make sure that she brushed her hair and her teeth in the morning, and supervise Brittany brushing her teeth in the evening.  R. 225.

B.      *School Records.*

Brittany was in regular classes at school.  R. 76.  A speech, language, and hearing screening conducted when Brittany was in kindergarten was unremarkable.  R. 88.

In November 2001, Angela Harrigan, Brittany's first grade teacher, wrote that Brittany needed improvement in reading, language arts, and class conduct.  R. 90.  In all other areas Brittany's performance met expectations.  R. 90.

On December 7, 2001, Mrs. Harrigan wrote that "Brittany's behavior has deteriorated a great deal lately. . . . [It is] . . . affecting her academic progress since she is frequently out of her seat and off task.  The teachers from art, P.E., and music have also noticed the decline.  Much of it seems to be attention seeking behaviors."  R. 89.

On March 12, 2002, Mrs. Harrigan observed that Brittany performed at grade level in reading but not math, and that academic modifications were not necessary.  R. 76.  Mrs. Harrigan noted that she had to insist that Brittany calm down when she came to school almost every morning.  During the day, Brittany would get loud and animated in any unstructured activity.  R. 77.  Mrs. Harrigan indicated that Brittany was off task three to four times an hour, but that she responded to redirection.  R. 80.  Brittany engaged in attention seeking behavior and responded positively to negative attention.  R. 77.  Brittany taunted other children and had low impulse control.  R. 77.

Brittany's comment card for that year indicated that Brittany was barely working at grade level.  Mrs. Harrigan wrote that Brittany would make better progress "if she would concentrate on listening and following procedures."  R. 91.  However, by the final quarter of the year, Mrs.

Harrigan observed that "Brittany's behavior has improved greatly and the academic skills have really taken off." She was advanced to second grade. R. 92.

Records from second grade indicated that Brittany's scores on a national standardized test were average for reading, mathematics, language, and spelling. R. 104.

Records from third grade indicated that Brittany received A and B grades, and made good effort, in all classes. R. 103. She was identified as needing improvement only in using time well and in working and playing with others. R. 103.

On March 9, 2004, a staff member at "Happy Hands" wrote that Brittany hit another child in the face because the other child was screaming at her. R. 105.

C.    *Treatment Records.*

In July 2000, Brittany was evaluated while in foster care. R. 107-13. The case worker, whose name is illegible, observed that Brittany was taking Adderall.[5] R. 110.

In December 2001, Brittany was seen by Cristina Parawan, M.D., for behavioral problems, including "constant talking, refusing to listen to her [parents], aggravating her brothers[,] and inability to concentrate." Herring reported to Dr. Parawan that Adderall had made Brittany "nasty and mean." Dr. Parawan referred Brittany to a psychiatrist for further management. R. 114.

In January 2002, Brittany was seen for a psychiatric examination by Adly Thebaud, M.D. R. 119-27. The chief complaints about Brittany at the time were that she did not follow rules, was

---

[5]    Adderall is the brand-name for an amphetamine prescribed for ADHD. *See* MEDLINE PLUS DRUG INFORMATION, Amphetamine, http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202031.html (last visited April 12, 2006).

defiant, had trouble listening, had trouble learning, had trouble staying in her seat, and was

controlling.  R.  119.  Her teachers observed Brittany's behavior had deteriorated.  R. 120.

Results of a mental status examination reflected that Brittany had trouble sitting still, had a

short attention span, was easily distracted, and had difficulty concentrating, but otherwise her

examination was generally positive.  R. 125-26.  She observed that Brittany had no problems in

appearance, was happy, had no involuntary movements, interacted well with her, made good eye

contact, had a normothymic[6] mood, was cooperative, alert, oriented, had good memory, judgment

and insight.  *Id*.  Her conclusion was ADHD, rule out ODD.  R. 127.  She assessed Brittany with a

GAF of 56.[7]  Finally, she prescribed Concerta.[8]

On January 29, 2002, Brittany began treatment at Devereux Outpatient Counseling

(Devereux).  At the time, Brittany's problems included poor grades, poor attention span,

withdrawal, disruptive behaviors, difficulty completing work, conflicts with authority, peers and

family, excessive anger, poor memory, aggression, lying, nightmares once per month, impulsivity,

---

[6]        A normal mood.  *See* STEDMAN'S MEDICAL DICTIONARY, 1219, 1810 (26TH ED.
1995).

[7]        A GAF rating between 51 and 60 reflects:

> Moderate symptoms (e.g., flat effect and circumstantial speech, occasional panic
> attacks) OR moderate difficulty in social, occupational, or school functioning (e.g.,
> few friends, conflicts with peers or coworkers).

SYNOPSIS OF PSYCHIATRY at 299.

[8]        Concerta is the brand-name for an extended release tablet of methylphenidate, also
sometimes known as Ritalin, a drug prescribed for ADHD.  MEDLINE PLUS DRUG INFORMATION,
Methylphenidate, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682188.html (last
visited April 12, 2006).

hyperactivity, and poor concentration.  R. 167-68.  Lyris Miller, M.S., assessed Brittany's GAF at 55.  R. 173.

On February 27, 2002, Paul Jacobson, M.D., interviewed Brittany at Devereux.  R. 158-60. Herring indicated that Brittany's behavior had improved somewhat with medication, but that she occasionally had some breakthrough symptoms.  R. 158.  At the interview, Dr. Jacobson observed that Brittany required frequent redirection.  R. 159.  He observed that Brittany enjoyed attention-seeking behaviors, but was goal-directed, relevant, coherent, logical, and had a mostly intact memory.  R. 159.  His impressions were ADHD and ODD.  He assessed a GAF of 40.  R. 159-60.

In a subsequent interview in March 2002, Dr. Jacobson observed that Brittany was alert, oriented, and cooperative.  Her behavior was under good control, and Dr. Jacobson observed no combativeness, intimidation, hostility, or rage.  R. 156.  However, at an examination later that month, Dr. Jacobson observed that Brittany was "excessively silly[,] . . . fidgety, and squirmy in her seat."  R. 154.  In April 2002, Brittany was polite and cooperative with no hyperactivity or agitation noted by Dr. Jacobson.  R. 152.

In June 2002, Miller wrote that she had been counseling Brittany each week since January 29, 2002.  R. 150.  Miller wrote that "Brittany has periods in which she cooperates with treatment and responds well to her behavior modification plan . . . .  At other times, she will actively defy rules and run about excessively."  R. 151.  Miller opined that Brittany had moderate limitations in cognitive and communicative function.  R. 134.  She saw no limitations in motor functioning. *Id*. She observed marked limitations in social function because of inattention, temper tantrums, lies, fighting, and a need for redirection.  R. 135.  She opined the Brittany had a moderate impairment in personal function because she would refuse to eat at home or school, even when presented with

her favorite foods. *Id*.  Finally, she opined that Brittany had a marked limitation in concentration, persistence, and pace due to difficulty concentrating, staying on task, listening and following directions, among other things. *Id*.

In June 2002, Brittany was seen at Star Consultants. R. 136-49.  S.E. Roberts, a therapist, observed that Brittany was shy and quiet. R. 138.  An in-home observation observed that "the children are yelled at often and appear timid and scared." R. 139.  The therapist noted that a teacher had recommended placement in an Exceptional Student Education class because Brittany hit other children, was talkative, did not follow directions, and acted out.  R. 143.  Finally, the therapist made a GAF assessment of 45.[9]  R. 136.

Beginning in April 2003, Brittany received treatment from Dawn Naimoli, B.S.W., at Strategies, Inc.  R. 192-204. Throughout the treatment, Brittany had successful and unsuccessful weeks.  R. 200-03.  She required redirection, but Naimoli observed positive responses to redirection.  R. 194-96, 198, 200, 202, 204.  By July 2003, Niamoli observed that during a group outing, Brittany was independent and required only initial cues to be redirected. R. 192.  Niamoli observed "[w]hile in my presence [Brittany's] behavior was excellent." *Id*.  However, Herring had represented to Niamoli that Brittany's behavioral problems had escalated. *Id*.

---

[9]       A GAF rating between 41 and 50 reflects:

Serious symptoms (e.g., suicidal ideation, sever obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

SYNOPSIS OF PSYCHIATRY at 299.

From May to October 2003, Brittany continued to be seen at Devereux by Aparna Kopuri, M.D.  R. 184-90.  Early in this period, Herring indicated Brittany's grades had gone downhill,  R. 190.  However, in September, Herring reported that Brittany had been doing well and had no problems at home or school.  R. 186-87.  Dr. Kopuri did not observe any hyperactivity or talkative behaviors.  R. 189.

Brittany was discharged from Devereux in October 2003.  The discharge summary reflects a GAF of 40.  Notes on the form indicated that Brittany would be seen at the Halifax Behavioral Services Center (Halifax).  R. 191.

The only treatment records from Halifax before the ALJ was one page of a psychiatric evaluation conducted on February 16, 2004.  This document does not contain any diagnosis or assessment made by the psychiatrist, Thomas Dow, M.D.  R. 207.

Kelly McCabe, who appears to be a targeted care manager affiliated with Halifax, prepared a functional assessment dated February 24, 2004.  McCabe opined that Brittany had a marked limitation in communicative functioning because of inappropriate, aggressive, and oppositional communication.  R. 205.  She opined that Brittany had a moderate limitation in motor function because of an inability to pay attention.  R. 205.  She opined that Brittany had an extreme limitation in social function because of poor social skills, verbal and physical aggression, combativeness with peers and adults, and oppositional defiance.  R. 206.  She opined that Brittany had a marked limitation in personal function because of poor hygiene, and refusal to bathe or clean herself.  R. 206.  Finally, she opined that Brittany had an extreme limitation in concentration, persistence or pace, because of poor impulse control, inability to focus, and because she could not be left unattended for more than two minutes.  R. 206.  McCabe indicated that she has had a

relationship with Brittany from January 13, 2003.  R. 206.  There is nothing in the file to indicate the information upon which McCabe relied in preparing her assessment.

        *D.      Reviewing Professionals.*

     In May 2002, Claire C. Huisentruit, Psy. D., completed a disability evaluation form at the request of SSA.  She concluded that Brittany had a severe impairment but that it did not meet, medically equal, or functionally equal, the listings.  She opined that Brittany had no limitations in the domains of acquiring and using information, moving about and manipulating objects, caring for yourself, and health and physical well being.   She opined that Brittany had less than marked limitations in the domains of attending and completing tasks and interacting and relating with others.   R. 128-33.

     In September 2002, Pamela D. Green, Ph. D., completed a disability evaluation at the request of SSA.  R. 178-183.  She concluded that Brittany had a severe impairment but that it did not meet, medically equal, or functionally equal, the listings.  She opined that Brittany had marked limitations in attending and completing tasks, less than marked limitations in interacting and relating with others because of "some ODD traits," and no limitations in the other domains. R. 180.

## IV.    STANDARD OF REVIEW.

     The process for determining whether a child is disabled "begins with the ALJ determining whether the child is 'doing substantial gainful activity,' in which case [the child] is considered 'not disabled' and is ineligible for benefits."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004) (quoting 20 C.F.R. § 416.924(a), (b)).  "The next step is for the ALJ to consider the child's 'physical or mental impairment(s)' to determine if [the child] has 'an

impairment or combination of impairments that is severe.'"  *Id.* (quoting 20 C.F.R. § 416.924(a),

(c)).  A "physical or mental impairment" under the terms of the Act is one that results "from

anatomical, physiological, or psychological abnormalities which can be shown by medically

acceptable clinical and laboratory diagnostic techniques . . . ."  20 C.F.R. § 416.908.

 If the child has a severe impairment, "the ALJ next assesses whether the impairment

'causes marked and severe functional limitations' for the child."  *Shinn*, 391 F.3d at 1278 (quoting

20 C.F.R. §§ 416.911(b); 416.924(d)).  "Limitations arising from pain count in this

determination."  *Id.* (citing 20 C.F.R. § 416.924(a)).  The impairment must be expected to cause

death or last for a continuous period of not less than twelve months.  *Id.* at 1279.

 "A child's impairment is recognized as causing 'marked and severe functional limitations'

if those limitations 'meet[ ], medically equal[ ], or functionally equal[ ] the listings.'"  *Id.* at 1278

(quoting 20 C.F.R. § 416.911(b)(1); citing 20 C.F.R. §§ 416.902; 416.924(a)).

 If the child's impairments do not meet or medically equal a listed impairment, the ALJ can

still conclude that the child's impairments are functionally equivalent to those in the listings.  "In

making this determination, the ALJ assesses the degree to which the child's limitations interfere

with the child's normal life activities."  *Id.* The Code of Federal Regulations specifies six major

domains of functioning that the ALJ should consider:  (i) acquiring and using information; (ii)

attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and

manipulating objects; (v) caring for yourself; and (vi) health and physical well-being.  20 C.F.R. §

416.926a(b)(1).  The regulations further provide benchmarks that children should have achieved

by certain ages.  20 C.F.R. § 416.926a(f)(3).

"A child's impairment is of listing-level severity, and so functionally equals the listings, if as a result of the limitations stemming from that impairment the child has marked limitations in two of the domains . . . , or an extreme limitation in one domain." *Shinn*, 391 F.3d at 1279 (internal quotation marks and citation omitted). A marked limitation in a domain exists when the "impairment(s) interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An extreme limitation in a domain exists when the "impairment(s) interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). In considering the severity of an impairment, the Commissioner may consider the effect of treatment, including medication. 20 C.F.R. § 416.924a(b)(9).

This Court's review of a final decision by the SSA is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The court may not reweigh the evidence or substitute its own judgment, and must affirm if the decision is supported by substantial evidence, even if the court finds that the proof preponderates against it. *Dyer*, 395 F.3d at 1210. While there is a presumption in favor of the SSA's findings of

fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

## V.      ANALYSIS.

Herring asserts two grounds supporting reversal of the Commissioner's decision.  First, she contends that the Commissioner failed to develop a full and fair record.  Second, she asserts that the ALJ did not properly evaluate the opinions of Brittany's treating physicians. These are the only issues I will address.[10]

### A.      Development of the Record.

Herring contends that the ALJ failed to fulfill her duty to develop a full and fair record because she did not obtain the records of Brittany's treatment at Halifax.  She asserts that the ALJ had a "special duty" to develop the record fully because Brittany and Herring were represented by an individual who was not an attorney.

"Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record."  *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  This obligation arises to a "special duty" when a social security claimant has not waived the right to representation by counsel at the hearing before the ALJ.  *Id.*

In this case, Herring and Brittany were represented by an individual who was not an attorney.  They do not contend that their representative was not qualified to represent them or was unfamiliar with social security administrative procedures.  Under these circumstances, the ALJ

---

[10]      The scheduling order advised the plaintiff that "[a]ny issue not specifically raised . . . will be considered to have been waived unless the interests of justice require the Court to consider the issue."  Doc. No. 9 at 2.

was not under a special duty to develop the record.  *See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

Furthermore, even if a special duty existed, reversal would not be warranted unless Herring established that she was prejudiced by the failure to develop the record fully.  *See Kelley v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985).  Herring does not articulate any prejudice that she suffered as a result of the ALJ's failure to obtain the treatment records from Halifax. The ALJ considered the assessment of Kelly McCabe, who was affiliated with Halifax, in rendering her decision, but found it inconsistent with the medical evidence as a whole.  Under these circumstances, Herring failed to establish that she was prejudiced by the failure to obtain all of the Halifax records.

B.      *Consideration of Brittany's Treating Professionals.*

Herring contends that the ALJ failed properly to evaluate the opinions of Brittany's treating physicians, Dr. Thebaud and Dr. Jacobson, and her therapists, Lyris Miller and Kelly McCabe.  The Commissioner responds that Miller and McCabe are not acceptable medical sources, that Dr. Thebaud was not a treating physician, and that the ALJ articulated good cause for her decision not to give great weight to the opinion of Dr. Jacobson.

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)(citing 20 C.F.R. § 404.1527(d)(2)). Good cause has been found "where the doctor[s'] opinion[s] [were] not bolstered by the evidence, . . . where the evidence supported a contrary finding[,] . . . [or] where the doctors' opinions were conclusory or

inconsistent with their own medical records." *Id.* (internal citations omitted).  The ALJ must

articulate the reasons for giving less weight to the opinion of the treating physician.  *Id.*

Both Miller and McCabe were treating therapists.  The Commissioner correctly argues

that therapists are not acceptable medical sources under the SSA regulations.  20 C.F.R. §

416.913(d).  Accordingly, while their opinions should be considered, they are not entitled to

controlling weight.  *See id.* § 416.913(e); *see also Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th

Cir. 2004).  In this case, the ALJ considered the treatment records from Devereux, which include

Miller's assessment.  She also considered McCabe's assessment, although she found it

inconsistent with the medical evidence as a whole.  As such, the ALJ adequately considered the

opinions of Brittany's treating therapists.

Turning next to Dr. Thebaud, the record supports the Commissioner's assertion that Dr.

Thebaud examined Brittany once, but did not render treatment over a period of time.  As such, Dr.

Thebaud is more akin to a consulting physician, rather than a treating physician.  "Generally, a

treating doctor's opinion is entitled to more weight than a consulting doctor's [opinion]."  *Wilson

v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *accord* 20 C.F.R. § 416.913(d)(1).  The ALJ's

opinion reflects that she considered Dr. Thebaud's assessment, R. 16, even though she did not

expressly state the weight given to that assessment.  Herring does not argue that Dr. Thebaud's

assessment, including a conclusion that Brittany had a GAF score of 56, was inconsistent with the

ALJ's conclusions regarding the extent of Brittany's functional limitations.  Based on the record

before the Court, therefore, Herring's argument that the ALJ erred in her consideration of Dr.

Thebaud's opinion is unavailing.

Herring's final argument is that the ALJ "ignored" Dr. Jacobson's evaluation.  Doc. No. 14 at 10.  There is no dispute that Dr. Jacobson was one of Brittany's treating physicians.  However, the ALJ's decision reflects that she did not ignore Dr. Jacobson's assessment.  Rather, the ALJ thoroughly reviewed Dr. Jacobson's opinion, including his conclusion that Brittany had a GAF score of 40 as of January 2002.  R. 16.  Moreover, the ALJ articulated the reason that she gave little weight to Dr. Jacobson's assessment of Brittany's GAF score, specifically because the assessment appeared to be based on Herring's reports of Brittany's conduct rather than on an objective evaluation of Brittany's conduct.

Substantial evidence in the record supports the reasons articulated by the ALJ for not affording great weight to Dr. Jacobson's opinion.  School records show that Brittany was getting good reports.  Dr. Jacobson observed that Brittany's behavior was under good control in his presence.  Brittany's therapists reported that Brittany had responded to treatment, although she still had breakthrough episodes of problematic behavior.  Dawn Naimoli, a social worker who worked with Brittany at Strategies, Inc., observed that Brittany's behavior was excellent even though Herring represented that Brittany's behavioral problems had escalated.

In sum, the ALJ considered each of the professional opinions at issue and accorded them the weight due under the law.  As for the opinion of Dr. Jacobson, a treating physician, the ALJ articulated good cause for giving less weight to his assessment of Brittany's functional capacity, and substantial evidence supports the ALJ's decision.  Therefore, the ALJ did not err in consideration of the opinions of physicians and therapists who treated or examined Brittany.

## VI.    RECOMMENDATION.

Because the Commissioner's decision is supported by substantial evidence and is based on correct legal principles, I respectfully recommend that the decision be **AFFIRMED**.  I further recommend that the Court direct the Clerk of Court to issue a judgment consistent with its ruling on this Report and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on April 13, 2006.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE


Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy